IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 3, 2022 Session

## METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE ET AL. v. DAVIDSON COUNTY ELECTION COMMISSION

**Appeal from the Chancery Court for Davidson County**
**No. 21-0433-IV      Russell T. Perkins, Chancellor**

_____

**No. M2021-00723-COA-R3-CV**

_____

At issue is an election commission's decision to set an election on proposed referendum measures to a local government's charter. In pre-election litigation over this decision, the trial court concluded, for various reasons, that the election commission's decision to hold the election should be reversed. The election commission now urges this Court to reinstate its decision to hold an election and to remand this matter to it with instructions to schedule a referendum election at a future date pursuant to Tennessee Code Annotated section 2-3-204(a). As explained in more detail in this Opinion, we conclude that this requested relief is not proper under the cited statute. Moreover, because this appeal cannot serve as a vehicle to grant the election commission any relief, we consider the matter moot. Notwithstanding this posture in the case, we do find it appropriate, in the exercise of our discretion, to address one of the specific legal issues presented by this appeal as an exception to the mootness doctrine. As to that issue, which concerns the interpretation of a form requirement the local government's charter places on petitions to amend the charter by referendum election, we agree with the trial court that the referendum petition at issue in this case ran afoul of the requirement in dispute.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated in Part; Affirmed in Part; and Remanded.**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

James F. Blumstein and Austin L. McMullen, Nashville, Tennessee, for the appellant, Davidson County Election Commission.

Wallace W. Dietz, Allison L. Bussell, Lora Barkenbus Fox, Catherine J. Pham, and Robert E. Cooper, Jr., Nashville, Tennessee, for the appellees, Metropolitan Government of Nashville & Davidson Co., Mayor of Metropolitan Government of Nashville & Davidson County, and Finance Director of Metropolitan Government of Nashville & Davidson County.

Daniel A. Horwitz and Lindsay E. Smith, Nashville, Tennessee, for *amicus curiae* Nashville Area Chamber of Commerce and Save Nashville Now.

James Roberts, Nashville, Tennessee, for *amicus curiae* 4 Good Government.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

This case concerns the decision of the Davidson County Election Commission ("the Commission") to hold a referendum election on July 27, 2021, with respect to a petition to amend the Charter of the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro Charter" or "Charter") sponsored by the group 4 Good Government ("4GG"). A previous petition sponsored by 4GG was declared deficient in a 2020 decision by the Davidson County Chancery Court. 4GG's present petition ostensibly aimed to correct the prior noted defects and recited that it was "to be voted on by the citizens on May 28, 2021 or June 14, 2021, whichever is earlier as permitted by Metro Charter § 19.01." Specifically, it proposed the following amendments:

1. **Limit Property Tax Rates – Add to Article 6, § 6.07, Paragraph 5:** *"Property Tax Rates shall not increase more than 3% per fiscal year upon enactment without a voter referendum, pursuant to Tenn. Code Ann. § 2-3-204. For Fiscal Years 2021-2022 and 2022-2023 the property tax rate(s) shall revert to Fiscal Year 2019-2020's tax rate(s), or lower if required by law. This amendment's provisions are severable."*

2. **Recall Elected Officials – (A) Add to Article 15, § 15.07:** *"Petitions to recall elected officials filed after January 1, 2021, under this section shall contain the signatures and addresses of registered qualified voters in Davidson County equal to ten (10) percent of the citizens voting in the preceding Metro general election in the district or area from which the recalled official was elected. Such Petitions shall be filed with the metro clerk within seventy-five (75) days of the date the notice is filed. This amendment's provisions are severable"* **(B) Replace existing Article 15, § 15.08, Paragraph 2 with:** *"A recalled official's name shall not appear on the recall ballot, but such official may qualify as a write-in candidate. This amendment's provisions are severable."*

- 2 -

3. **Abolish Lifetime or Other Benefits for Elected Officials – Add to Article 18, § 18.05, Paragraph 1:** *"No elected official shall receive any benefits at taxpayer expense as a result of holding such elected office without a voter referendum."*

4. **Preserve Voters' Charter Amendments – Create Article 19, § 19.04:** *"Voter-sponsored Charter Amendments approved after January 1, 2021, shall be amended only by voter-sponsored Petition, notwithstanding any law to the contrary."*

5. **Protect Publicly-Owned Parks, Greenways & Lands – Create Article 18, § 18.18:** *"No portion of a publicly-owned park, greenway, or other real property shall be transferred or conveyed without 31 votes of Metro Council. All transfers of interest in real property shall be at fair market value based on an independent appraisal. Public referendum shall be required for transfers of interest in such publicly-owned properties valued over $5,000,000, and for leases exceeding twenty (20) years, unless prohibited by state law."*

6. **Protect Promises to Nashville – Create Article 18, § 18.19:** *"If a professional sports team leaves Nashville, or ceases playing professional games for more than twenty-four (24) consecutive months during the term of a team's ground lease, all sports facilities and related ancillary development related to the defaulting team shall revert to public property, and all related contracts shall terminate, including land leased from the Nashville Fairgrounds, and just payment shall be paid, if required by law."*

While 4GG filed the petition with the Metropolitan Clerk in late March 2021, the Clerk did not certify a copy of the petition to the Commission until May 6, 2021. The Commission voted on May 10, 2021, to place the petition on the ballot. The following day, the Metropolitan Government of Nashville and Davidson County, the Metro Mayor, and Metro Finance Director (collectively "Metro Litigants") filed a petition for writ of certiorari and writ of mandamus in the Davidson County Chancery Court.[1] The Metro Litigants asserted a number of infirmities with the proposed Charter amendments, in addition to contending that general deficiencies existed with respect to the petition itself.

In an order entered on June 22, 2021, the trial court held that a number of the objections raised by the Metro Litigants were not ripe for pre-election judicial challenge under *City of Memphis v. Shelby County Election Commission*, 146 S.W.3d 531 (Tenn.

---

[1] According to the trial court record, the Metro Litigants also asserted other original jurisdiction claims, and the Election Commission asserted a counterclaim during the course of litigation. These claims were, however, severed from the instant litigation.

2004). As the Tennessee Supreme Court generally instructed in that case, "pre-election challenges to the substantive constitutional validity of referendum measures are not ripe for determination by a court, while pre-election challenges to the form or facial constitutional validity of referendum measures are ripe for judicial scrutiny." *Id.* at 539. Despite its finding that some objections to the amendments were not presently ripe for review under the *City of Memphis* framework, the trial court nonetheless concluded that several objections were. It further concluded that several infirmities plagued the amendments and petition and that the Commission's decision to place the petition on the ballot should be reversed. In relevant part, the court's general conclusions were as follows:

> 4. The Court agrees with the Metropolitan Government that 4GG's Petition did not meet the "prescribe a date" requirement under § 19.01 of the Metropolitan Charter.
>
> 5. The Court agrees with the Metropolitan Government that the "Abolish Lifetime or Other Benefits for Elected Officials" measure and the "Protect Promises to Nashville" Amendments are defective in form, confusing to the electorate, and properly subject to pre-election challenge on this ground.
>
> 6. The Court agrees with the Metropolitan Government that the "Limit Property Tax Rates" Amendment and the "Protect Promise[s] to Nashville" provision are defective in form and unconstitutional in form under *City of Memphis* and *4GG-I.*
>
> 7. The Court agrees with the Election Commission that certain of the Metropolitan Government's specific challenges to the Limit Property Tax Rates Amendment, the Recall Elected Officials Amendment, Abolish Lifetime or Other Benefits Amendment, or Protect Promises to Nashville Amendment relate to substantive constitutionality and are, accordingly, not ripe for pre-election challenge on those specific grounds.
>
> 8. The Court agrees with the Metropolitan Government on the severability issue and concludes that none of the Amendments can properly be presented to the qualified voters of Davidson County for referendum election on July 27, 2021.

Certain minor corrections in language were made to certain parts of the trial court's order in an "Order of Correction" entered on June 23, 2021, and the Commission thereafter filed a notice of appeal in this Court on June 25, 2021.[2]

---

[2] We observe that a separate notice of appeal was also filed in this Court on July 23, 2021, with specific reference to the June 23, 2021, "Order of Correction." Whereas a new appeal number was initially assigned in connection with the second notice of appeal, we consolidated the matters into one appeal in a

On June 29, 2021, the Commission filed a motion in this Court for "an expedited briefing schedule and hearing," while also filing a request with the Tennessee Supreme Court that it assume jurisdiction over the appeal pursuant to Tennessee Supreme Court Rule 48 and Tennessee Code Annotated section 16-3-201(d). Of note, four days before this date, on the same day it filed its notice of appeal concerning the actions taken regarding its decision to set an election for July 27, the Commission canceled the July 27 election. It further conditionally reset the election to September 21, 2021. The Commission noted this information in its motion before the Supreme Court, stating that the resetting had been "conditioned on authorization from an appropriate court concluding that the Election Commission acted appropriately in voting to place the proposed amendments on a ballot." For their part, the Metro Litigants argued against Supreme Court intervention and submitted, among other things, that the action was moot:

> Worse yet, after its loss at the trial court, the Election Commission conditionally set the petition for another referendum election on September 21, 2021, far outside the 75- to 90-day timeframe required by state law. Thus, the conditional September 21 referendum-election date not only fails to provide a basis for expedited appeal, but it illustrates that this Court cannot grant the relief requested by Appellant, rendering the case moot.

In an order dated July 9, 2021, the Supreme Court denied the motion to assume jurisdiction, concluding that extraordinary action to assume jurisdiction was not warranted in light of the "current totality of the circumstances, including the relevant timeline and the procedural posture of this case." (Tenn. July 9, 2021) (order denying motion to assume jurisdiction). Thereafter, in an order filed July 13, 2021, this Court denied the Commission's request for an expedited briefing and hearing schedule.

## ISSUES PRESENTED

In the present appeal, the trial court's findings are vigorously disputed by the parties, particularly those findings pertaining to "ripeness" under the *City of Memphis* decision. The core of this threshold dispute among the parties is reflected in the marked divergence in how the issues are framed in their appellate briefs. Whereas the Metro Litigants argue that the trial court properly found several of the petition's amendments to be defective in "form" and thus subject to pre-election challenge, the Commission maintains that the trial court actually relied on, impermissibly, "broad 'as-applied' substantive objections" to block access to a referendum election.

The Commission's brief specifically presents the following issues for review, restated verbatim:

---

per curiam order filed on July 28, 2021.

1. Whether, consistent with *City of Memphis v. Shelby County Election Commission*, a <u>county election commission</u> may rely on substantive constitutional issues in determining whether to place an otherwise-qualifying charter-amendment petition on a referendum ballot and whether the commission's decision not to consider substantive constitutional issues can be deemed arbitrary or capricious?

2. Whether, consistent with *City of Memphis v. Shelby County Election Commission*, a <u>court</u>, before a referendum election, may, as the Trial Court did, rely on "as-applied" (as distinct from "facial") substantive constitutional challenges of proposed charter amendments to stop an election that a county election commission has approved and scheduled?

3. Whether, consistent with *City of Memphis v. Shelby County Election Commission*, a <u>court</u> may validly characterize an "as-applied" challenge to the substantive constitutionality/validity of proposed charter amendments as a challenge to the "form" of the proposed charter amendments, when a county election commission has approved those proposed amendments for voter consideration?

4. Whether the Election Commission erred in its interpretation of the terms of and remedy for a putative violation of the "prescribe-a-date" provision of the Metro Charter?

5. Whether the Trial Court properly applied severability principles when it held that valid proposed amendments may not be presented to voters if even one of multiple, separate charter amendments proposed in a petition is invalid?

6. Whether there is any material evidence in the record and a rational basis to support the Election Commission's decision to place the proposed Charter amendments on the ballot?

The Metro Litigants, as the Appellees in this appeal, phrase the issues on appeal as follows:

1. Whether the Chancery Court correctly held that defects in 4 Good Government's petition to amend the Metropolitan Charter by referendum election were ripe for judicial review under *City of Memphis v. Shelby Cty. Election Comm'n*, 146 S.W.3d 531 (Tenn. 2004).

2. Whether the Chancery Court correctly held that the Charter amendment petition failed to "prescribe a date" for the referendum election as

required by Metropolitan Charter § 19.01 and thus could not be placed on the ballot.

3. Whether the Chancery Court correctly held that proposed Charter amendments 1 ("Limit Property Tax Rates") and 6 ("Protect Promises to Nashville") are defective in form and precluded from the ballot because they involve subject matter beyond the referendum power.

4. Whether the Chancery Court correctly held that proposed Charter amendments 3 ("Abolish Lifetime or Other Benefits") and 6 ("Protect Promises to Nashville") are defective in form and precluded from the ballot because their language is vague and confusing such that a voter could not ascertain the amendments' meaning for purposes of casting an intelligent vote.

5. Whether the Chancery Court correctly held that the defective proposed Charter amendments are not severable from the rest, thereby requiring the referendum election to be canceled.

The appeal has also prompted several interested groups to file briefs, with permission of this Court, as *amicus curiae*. As is relevant to our discussion herein, we observe that one of these groups, Save Nashville Now, contends that the appeal is moot, a point also made in passing by the Metro Litigants' brief. Another participating *amicus curiae*, the Nashville Area Chamber of Commerce, has filed a brief in support of the trial court's decision relative to the "prescribe a date" provision in the Metro Charter.

## DISCUSSION

The present appeal concerns the trial court's review of the Commission's action under the common law writ of certiorari. The standard governing such review is well-settled law:

> Upon review, the court may reverse or modify the decision of an administrative body or tribunal only upon determining that the action 1) violated a statutory or constitutional provision; 2) was made in excess of the agency's authority; 3) was based on unlawful procedure; 4) was arbitrary or capricious; or 5) was not supported by material evidence.

*Dill v. City of Clarksville*, 511 S.W.3d 1, 9 (Tenn. Ct. App. 2015). Whether a board or tribunal acted illegally is a question of law, and with respect to appellate oversight, "[o]ur standard of review is the same as that of the trial court." *Id.*

Rather than immediately turn to an examination of the merits of the raised grievances concerning 4GG's petition and the proposed Charter amendments, we must first address the question of justiciability. "A case must remain justiciable through the entire course of litigation, including any appeal." *Alliance for Native Am. Indian Rights in Tenn., Inc. v. Nicely*, 182 S.W.3d 333, 338 (Tenn. Ct. App. 2005). If a case does not involve a "genuine, continuing controversy requiring the adjudication of presently existing rights," it is not justiciable. *Id.* Here, the justiciability doctrine at issue is mootness. "A moot case is one that has lost its justiciability because it no longer involves a present, ongoing controversy." *Id.* If a case no longer serves as a means to provide judicial relief to the prevailing party, it will be considered moot. *Id.*

The foregoing consideration is especially relevant here in light of the request for relief advanced by the Commission in the prayer of its brief. In pertinent part, the Commission requests that this Court reverse the trial court and "remand the matter to the Commission with instructions to schedule a referendum election at a date in the exercise of its appropriate, statutory discretion pursuant to T.C.A. § 2-3-204(a)." As discussed in more detail below, it is not possible for an election to occur within the time parameters fixed by the cited statute, and therefore, we fail to see how we can order the Commission to take an action not permitted by law.

However, before turning to that specific timing question, we find it prudent to recap the posture in which this case presents itself. The present appeal relates to review of the Commission's decision to set an election on July 27, 2021 in reference to the proposed Charter amendments. Specifically, the appeal is from a writ of certiorari proceeding in which the trial court sustained the Metro Litigants' challenge to the setting of that July 27 election. The trial court's judgment was issued on June 22, 2021. Although it appears from certain filings concerning this case that the State Coordinator of Elections had granted a request to change the deadline to mail military and overseas ballots in reference to the July 27 election date, the Commission did not take steps to secure expedited review with the aim of holding an election on July 27 or at any point within the time frame allotted by Tennessee Code Annotated section 2-3-204, a point that will be further elaborated upon below. Instead, the Commission filed its appeal on June 25, 2021, albeit while also *cancelling* the July 27 election setting on the same date. The Commission conditionally reset the referendum election for September 21, 2021, and a few days later, on June 29, 2021, finally sought expedited review in this Court and in the Tennessee Supreme Court.[3] The Commission's request for expedited appellate oversight was clearly to facilitate the proposed September 21, 2021 election date. The Tennessee Supreme Court declined to assume jurisdiction, and we denied expedited review. The Supreme Court's decision referenced the "current totality of the circumstances, including the relevant timeline and the procedural posture of this case."

---

[3] As discussed previously, the Commission requested that the Supreme Court assume jurisdiction pursuant to Tennessee Supreme Court Rule 48 and Tennessee Code Annotated section 16-3-201(d).

Based on our discussion below pertaining to the text of Tennessee Code Annotated section 2-3-204, it is not immediately clear to us on what basis the Commission believed the September date would be appropriate under that statute.[4]  In any event, that date has obviously now passed without an election.  According to a filing submitted by one of the participating *amicus curiae*, Save Nashville Now, it had challenged the Commission's decision to schedule an election in September in a separate writ of certiorari proceeding.  According to Save Nashville Now's submission, the Commission successfully moved to dismiss that other litigation as moot, apparently arguing, among other things, that there was no relief to be granted because the Commission had already stipulated that no election would occur on September 21.

Of course, the Commission now ultimately desires instruction from this Court that it may reset the election at a future date pursuant to Tennessee Code Annotated section 2-3-204.  As we have already alluded to, this is simply not possible.  Tennessee Code Annotated section 2-3-204 states in part as follows:

> (a) **Elections on questions submitted to the people <u>shall be held</u> on dates set by the county election commission but not less than seventy-five (75) days nor more than ninety (90) days after the county election commission is directed to hold the election under the law authorizing or requiring the election on the question**. If the election is to be held in more than one (1) county, the county election commissions shall meet and set the date jointly.
>
>  . . . .
>
> (c) If the date for an election on a question, as set by a county election commission or by two (2) or more commissions jointly, falls within ninety (90) days of an upcoming regular primary or general election being held in the jurisdiction voting on the question, the commission or commissions may reset the date of the election on a question to coincide with the regular primary or general election, even though this may be outside of the time period established herein. All dates dependent on the date of the election shall be adjusted accordingly and any acts required to be done by these dates shall be performed timely if done in accordance with the adjusted dates.

---

[4] According to materials submitted by Save Nashville Now, the Commission's resolution to conditionally reset the election to September had identified a permissible election window of September 8, 2021 through September 23, 2021.  Again, although we fail to understand how the Commission believed this to be appropriate, such an application of the window in Tennessee Code Annotated section 2-3-204 clearly appears to assume that the timeline was triggered on June 25, 2021, the date the Commission cancelled the July 27 setting.

Tenn. Code Ann. § 2-3-204 (emphases added).

At oral argument, when questioned how a future election setting could comply with this statute, counsel for the Commission argued that it is the decision of this Court that triggers the timeline for an election setting. Indeed, counsel specifically stated as follows: "[I]t would be the Court that would be directing the Commission to hold the election and the time frame would then be triggered by the court's order." Counsel then continued on, stating, "If this Court undoes the order of the trial court . . . it would direct the Commission to hold the election . . . pursuant to 2-3-204(a). And that's when the timing would start." Respectfully, we disagree. Notably, we observe that a similar argument was offered by the Commission in another case, one that specifically involved the interpretation of Tennessee Code Annotated section 2-14-102(a). That statute governs the setting of special elections for office vacancies and requires them to be held "not less than seventy-five (75) days nor more than eighty (80) days after the officer or body charged with calling the election receives notice of the facts requiring the call." Tenn. Code Ann. § 2-14-102. In *Wallace v. Metropolitan Government of Nashville*, 546 S.W.3d 47 (Tenn. 2018), the Commission argued that the date of the Supreme Court's ruling should be deemed "the date on which 'the officer or body charged with calling the [special] election receives notice of the facts requiring the call,' thereby triggering the statutory time-frame for setting the special election." *Id.* at 58 n.14. The Supreme Court squarely rejected this argument, stating that the suggestion was "tantamount to inviting us to judicially amend the statute." *Id.* We similarly decline the argument offered by the Commission here; we find no support for it in the text of the statute.

As we understand the matter, the Commission was "directed to hold the election," *see* Tenn. Code Ann. § 2-3-204(a), when the Metropolitan Clerk certified a copy of the petition containing the proposed amendments on May 6, 2021. Indeed, pursuant to the Metro Charter, the duty to hold an election is contingent upon the Metropolitan Clerk providing such a certified copy: "The metropolitan clerk shall immediately certify to the county commissioners of election copy of such resolution or petition and **it shall thereupon be the duty of said commissioners of election to hold a referendum election** with respect thereto." Metro Charter § 19.01 (emphasis added). Ninety days from May 6, 2021 was August 4, 2021. Whereas the prior July 27, 2021 election date at issue in the trial court's order undoubtedly fell within the permitted statutory time frame for the holding of an election, the Commission canceled that election date and did not seek expedited review so as to attempt to hold an election within the permitted time frame, whether on July 27 or otherwise. Instead, it reset the election for September 21, 2021, a date that did not fall within the time parameters of Tennessee Code Annotated section 2-3-204. Logically, any future election date also would not fall within the statutorily-mandated time for holding an election on referendum questions. We cannot, therefore, remand the matter and order that the Commission set a date for an election on the amendments. The case is accordingly moot given our inability to provide the requested relief sought by the Commission. *See Nicely*, 182 S.W.3d at 338.

- 10 -

Had the Commission sought expedited appellate review of a proposed election within the time parameters of Tennessee Code Annotated section 2-3-204 instead of an election date beyond the time permitted by the statute, no doubt, extremely prompt action would have been required by this Court, or the Supreme Court. The appellate courts, however, have given prompt attention to election matters before. *See, e.g.*, *Wallace*, 546 S.W.3d at 51 (involving a request by the appellant, on the same date he filed his notice of appeal, that the Supreme Court assume jurisdiction); *City of Memphis*, 146 S.W.3d at 533 n.1 (involving a case where the Supreme Court's September 10, 2004 order gave the parties mere days to brief the matter, with the opinion being quickly issued on September 15, 2004). The Commission did not meaningfully attempt to facilitate such a possibility, however. Indeed, for whatever reason, it was not until a week after the trial court's June 22, 2021 judgment that the Commission sought expedited review from this Court and the Supreme Court. Moreover, as already noted, the Commission represented at that time its intent to hold an election in September 2021, outside of the permitted time frame.

Although the Commission has offered argument that this Court has "remedial authority" to give relief by ordering an election and invokes Rule 36 of the Tennessee Rules of Appellate Procedure in support thereof, we disagree with its position. Rule 36 provides that this Court shall "grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires and may grant any relief, including the giving of any judgment and making of any order." Tenn. R. App. P. 36. We fail to see how this text gives us a license to order an election inconsistent with the timing required by law. Indeed, as we have noted, the statute places limits on when the election shall be held. Just as we cannot endorse the Commission's argument that our decision triggers the timeline for the setting of an election, an argument which is an effective invitation to "judicially amend the statute," *Wallace*, 546 S.W.3d at 58 n.14, we cannot otherwise ignore what the clear language of the statute requires.

Although the appeal is technically moot in light of our foregoing discussion, we acknowledge that case law allows this Court, in its discretion, to conclude that exceptions to the mootness doctrine exist. Among other reasons, we may conclude that issues are deserving of consideration when the "public interest" militates in favor of addressing disputed issues of great importance to the public and the administration of justice. *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cty.*, 301 S.W.3d 196, 208 (Tenn. 2009). To guide our discretion in deciding whether such a "public interest" exception is applicable, we address the following threshold considerations:

> (1) the public interest exception should not be invoked in cases affecting only private rights and claims personal to the parties; (2) the public interest exception should be invoked only with regard to "issues of great importance to the public and the administration of justice"; (3) the public interest exception should not be invoked if the issue is unlikely to arise in the

future; and (4) the public interest exception should not be invoked if the record is inadequate or if the issue has not been effectively addressed in the earlier proceedings.

*Id.* at 210–11 (internal footnotes omitted). If the above considerations do not exclude the invocation of the public interest exception to mootness, we then "balance the interests of the parties, the public, and the courts to determine whether the issues in the case are exceptional enough to address." *Id.* at 211. As part of this balancing, we may consider, among other things, the following:

(1) the assistance that a decision on the merits will provide to public officials in the exercise of their duties, (2) the likelihood that the issue will recur under similar conditions regardless of whether the same parties are involved, (3) the degree of urgency in resolving the issue, (4) the costs and difficulties in litigating the issue again, and (5) whether the issue is one of law, a mixed question of law and fact, or heavily fact-dependent.

*Id.* (internal footnotes omitted).

Here, as a matter of public interest, the issue pertaining to the "prescribe a date" provision from Metro Charter § 19.01 is worthy of current examination notwithstanding the fact that the case is otherwise moot. The "prescribe a date" provision from Metro Charter § 19.01 requires that a petition proposing amendments to the Charter "prescribe a date not less than eighty (80) [days] subsequent to the date of its filing for the holding of a referendum election at which the electorate of the metropolitan government will vote to ratify or to reject the amendments proposed." Metro Charter § 19.01. This provision is at issue here due to the fact that 4GG's petition to amend the Charter *did not* prescribe a single date; rather, 4GG's petition proposed for amendments "to be voted on by the citizens on May 28, 2021 or June 14, 2021, whichever is earlier as permitted by Metro Charter § 19.01." The trial court's conclusion that 4GG's petition ran afoul of the "prescribe a date" provision is deserving of consideration for a number of reasons in our opinion. First, this is not a matter that is confined to private rights and claims. Rather, the issue broadly concerns the interest of the public at large and the manner in which citizens may amend the Charter. We consider this to be a matter of great public interest, and this case provides an opportunity to resolve this issue and avoid further protracted litigation on it in the future. As should be evident from our ensuing discussion, there is obviously an incentive for petitioners to *not* prescribe a single date in petitions to amend the Charter, and bringing clarity as to the propriety (or lack thereof) of this practice is a worthy use of our judicial resources. The general public interest in this provision is evidenced by, among other things, the filing of an *amicus* brief on the issue by the Nashville Area Chamber of Commerce.

- 12 -

In addition to the above considerations, we note that there is nothing impeding our review of the issue now, as there is no need for further development of a factual record. In our view, the question before us is a legal one, namely whether the Charter does, in fact, require citizens proposing Charter amendments to prescribe a single date in their petition. Additionally, we are of the opinion that our examination of the issue now will provide guidance to the Commission as to how it should carry out its duties moving forward. *See Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 211 (noting the relevance of considering the assistance that a decision will provide to public officials). Finally, we consider the concern that exists over the costs already incurred by the parties in this case and the potential time difficulties[5] that could accompany any future pre-election judicial review.

Having found it appropriate to address the issue pertaining to the "prescribe a date" provision, we now turn our attention to the heart of the matter. The trial court concluded that the Commission had acted improperly by not finding it consequential that 4GG's petition did not "prescribe a date" as required under the Metro Charter. In relevant part, the trial court correctly observed that 4GG's petition had listed "two alternative dates" and opined that "[l]egal prerequisites . . . must be met and the Election Commission's failure to insist that the 'prescribe a date' legal requirement be complied with as written is not entitled to deference upon judicial review." The trial court reasoned that the "prescribe a date" requirement

> 1) sets the governing timeline; 2) permits the Election Commission to determine whether the petition violates the prohibition on submitting a petition to voters more than once every two years; 3) prevents backdoor extensions of the deadline for obtaining signatures; 4) provides clarity for potential signatures; and 5) consistent with fairness, notifies potential opponents, in advance of the petition's filing, what the Petition prescribes as the election date for purposes of a potential counter-campaign.

The Commission takes umbrage at the trial court's interpretation of the "prescribe a date" provision, even initially arguing that 4GG's petition was compliant with the Charter requirement. According to the Commission, 4GG's petition permissibly proposed "alternate dates" but with "a clear decision rule about which of the alternative dates controls." The trial court's insistence on a single date, it submits, reads an emphasis into the provision that "does not appear in the text." Indeed, the Commission argues that "[t]he Trial Court read the provision as if the word 'a' were underlined and bolded." True enough,

---

[5] Parties, of course, should pursue every available procedural means, with expediency, to timely seek judicial review, whether at the trial or appellate level, when there are time-sensitive election matters at stake. Of note, according to the submission of Save Nashville Now, the Commission apparently argued, in the context of the writ of certiorari proceeding relative to the setting of the September 2021 election date, that sufficient time exists for a judicial challenge once a referendum is set under Tennessee Code Annotated section 2-3-204.

- 13 -

the word "a," as utilized in the phrase "a date" in Metro Charter § 19.01, is neither underlined nor bolded, but we fail to see how that in any way changes the fact that the "prescribe a date" provision textually demands a single date. Indeed, the language simply is what it is, and here, the controlling language provides that the petition "**shall** . . . prescribe a date not less than eighty (80) [days] subsequent to the date of its filing for the holding of a referendum election." Metro Charter § 19.01 (emphasis added). Thus, it is clear: in order to be compliant with the Charter's requirements, the petition "shall" prescribe "a date." This language and its accompanying context contemplate a single date, not multiple dates accompanied by a "decision rule."

The Commission argues, however, that the importance of a single prescribed date is not what it seems, apparently in an attempt to repudiate the notion that a single prescribed date is, in fact, demanded. Pointing to Tennessee Code Annotated section 2-3-204(a), the Commission observes that *it* ultimately is responsible for the setting of an election date. Based on our prior discussion in this Opinion pertaining to the text of Tennessee Code Annotated section 2-3-204(a), we obviously will not quibble with the argument that the date prescribed in a referendum petition does not absolutely control when a referendum election will occur. That said, this does not mean that the *requirement* to prescribe a date is itself somehow advisory or lacks importance. It is a requirement per the text, not a suggestion; indeed, the text mandates that "a date" be prescribed, and that date affects, as the trial court recognized, the deadline for complying with another "form" requirement incident to submitting a referendum petition to an election. Consider the practical interplay between the following two requirements that must be adhered to when attempting to amend the Charter. First, although the Charter can be amended "upon petition," the petition must be "signed by ten (10) per cent of the number of the registered voters of Nashville-Davidson County voting in the preceding general election." Metro Charter § 19.01. Moreover, as already discussed in connection with this issue, the petition "shall also prescribe a date not less than eighty (80) [days] subsequent to the date of its filing for the holding of a referendum election." *Id.* Given the latter mandate to prescribe "a date" and the temporal marker associated therewith, the Charter effectively requires that, in order to be sufficient, petitions to amend it must have garnered the requisite number of signatures at least eighty days prior to the prescribed date.

To ignore the plain language connected to the "prescribe a date" requirement from the Charter, of course, would completely eviscerate this deadline. As the Nashville Area Chamber of Commerce has argued on appeal:

> [A]llowing petitioners to prescribe multiple dates on a petition means that there is no actual deadline for gathering signatures at all, because if petitioners can simply reserve multiple backup election dates, then petitioners may unilaterally extend their signature deadline and rely on backup dates indefinitely until a sufficient number of signatures has been secured.

The "prescribe a date" requirement therefore does "prevent[] backdoor extensions of the deadline for obtaining signatures," as the trial court noted, and also "provides clarity for potential signatures." Without knowing this deadline, citizens will not know the period in which support or opposition to a signature campaign needs to be mounted.[6]

---

[6] As far as notice is concerned, the trial court also decided, as already outlined, that "consistent with fairness, [the "prescribe a date" requirement] notifies potential opponents, in advance of the petition's filing, what the Petition prescribes as the election date for purposes of a potential counter-campaign." The Nashville Area Chamber of Commerce emphasizes the importance of this consideration in its *amicus* brief, arguing that permitting the reservation of multiple potential dates

> would also give proponents of a petition a seriously unfair advantage over their opponents regarding an election itself, given that it would enable petitioners—and only petitioners—to know when an election will be held. Petitioners alone control when their signatures are filed with the Metro Clerk. Thus, by prescribing two or more election dates on a petition—the Election Commission's "clear decision rule" proposal would allow petitioners to prescribe *hundreds* of potential dates if they wished—and then indicating that the election will be held on "whichever [date] is earlier as permitted by Metro Charter § 19.01," petitioners alone can control the date of a referendum election based strictly upon the date when they file their signatures.

> Thus, regardless of how many dates a petition prescribes, petitioners (and petitioners alone) will know—in advance of filing—when an election will be held, because petitioners alone will know when they intend to file their petition with the Metro Clerk. By contrast, *opponents* of a petition—who have no way of knowing or controlling when a petition will be filed—will necessarily be left to guess the date of the election until the moment that petitioners file their signatures with the Metro Clerk.

> The unfair advantage that such superior knowledge affords petitioners cannot be overstated. For example, it would allow petitioners—and only petitioners—to buy, in advance of filing their signatures with the Metro Clerk, the bulk of prime advertising spots "during the pivotal final days before the election," *Tennesseans for Sensible Election Laws v. Tennessee Bureau of Ethics & Campaign Fin.*, No. M2018-01967-COA-R3-CV, 2019 WL 6770481, at *20 (Tenn. Ct. App. Dec. 12, 2019)—or even the critical "weeks immediately before" an election, *see Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 334 (2010)—because only they will know in advance of filing when Election Day will be. *Id.* ("It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held. There are short timeframes in which speech can have influence.").

(internal footnote omitted).

Although the notice given by the prescribed date is not necessarily exact in reference to the actual date of an election given the authority of the Commission to set the election date within the window provided for in Tennessee Code Annotated section 2-3-204, the above cited concerns by the Chamber of Commerce are certainly still real ones. Of course, regardless of this consideration, we have already noted how the "prescribe a date" requirement affects the timeline for actually obtaining signatures.

Although the Commission appears to argue in its brief that it is entitled to deference as to its belief that alternative dates can satisfy the "prescribe a date" requirement, we disagree. In the previously-discussed *Wallace* decision, the Supreme Court noted that "principles of statutory construction guide us in our interpretation of the Charter." *Wallace*, 546 S.W.3d at 52. In further stating that its review of a particular provision of the Charter was "without any deference to the interpretations of the Commission," *id.*, the Supreme Court explained in relevant part as follows:

> This is not a case in which an administrative agency has construed and applied its own rules or policies. The issue in this case is the proper construction of a provision of the Charter. . . . To the extent that the Commission's interpretation of the Charter is akin to an agency's interpretation of its controlling statutes, we are not bound by that interpretation, particularly where the controlling statute is not ambiguous. The Commission's interpretation of the Charter is certainly entitled to our respect; however, it is not entitled to our deference.

*Id.* at 52 n.7 (internal citation omitted). As we have already explained, the language of the Charter here is clear: a petition seeking to amend the Charter "shall" prescribe "a date." Metro Charter § 19.01. This is a requirement that must be met per the language in the Charter. Further, although it is true that an ensuing election date might not actually coincide with the date a petition prescribes due to the authority given to the Commission by general state law, the prescribed date is in no way meaningless as more or less suggested by the Commission. Indeed, as we have noted herein, given the signature requirement that exists under Metro Charter § 19.01, the prescribed date in effect dictates the governing deadline by which supporters of a referendum measure must obtain the requisite number of signatures to warrant holding a referendum election. We agree with the trial court that the petition here was invalid given the petitioners' failure to prescribe a single date in compliance with the Charter, and therefore, the Commission acted illegally in acting to set an election with regard to the petition's proposed amendments.

As to the issues directly connected to the proposed Charter amendments themselves, we note initially that resolution of these remaining issues would not have been necessary even if this appeal could have, at the outset, theoretically served as a means to provide the Commission with relief. We make this observation given our conclusion above concerning the "prescribe a date" provision from the Metro Charter. Indeed, given the petition's failure in form with respect to that requirement, the petition was, as the trial court recognized, "invalid as a whole." This is not to say that we would have been foreclosed from addressing the remaining issues because of our holding concerning the "prescribe a date" provision if this case otherwise presented a live controversy. It is simply to acknowledge that addressing the remaining issues would have been unnecessary to the ultimate determination of whether the proposed amendments should have been set for an election. In other words, our opinion on the "prescribe a date" issue would have given us an occasion to pretermit

any remaining concerns connected to the petition.[7]  That issue alone would have been dispositive of resolving the propriety of the Commission's action.

This initial observation notwithstanding, the question here is whether we should address the remaining issues on appeal given the otherwise moot nature of the case. When the Commission addressed the question of mootness in a filing before our Supreme Court in support of its request for relief under Tennessee Supreme Court Rule 48 (an argument which is incorporated by reference in its reply brief in this Court), it contended that the "public interest" exception was applicable.  As evidenced by our discussion above, we certainly agree with the Commission on this point inasmuch as this appeal relates to the "prescribe a date" provision, and our Opinion on this issue will hopefully assist the Commission to evaluate the validity of any future referendum petition vis-à-vis the "prescribe a date" requirement.  We respectfully disagree, however, that the remaining issues argued on appeal are appropriate for our consideration.  As we perceive it, beyond the fact that any opinion on these particular issues would be purely advisory, we can only speculate that these same specific questions will manifest in the future.  We therefore exercise our discretion to abstain from any other appellate pronouncements given the mootness of the case.

A threshold consideration guiding our discretion relative to the public interest exception is whether an issue is unlikely to arise in the future. *See Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 210.  Moreover, assuming this and other threshold considerations do not exclude the invocation of the public interest exception, we are permitted to consider, among other things, the likelihood that the issue will recur under similar conditions and the degree of urgency in resolving the issue. *Id.* at 211.  Here, any utility in expressing an opinion on any of the specific proposed Charter amendments presupposes that these matters will (a) again be an object of a future referendum petition (b) timely garner sufficient citizen support to satisfy the Charter's signature requirement, (c) exist in substantially the same form, and (d) be the subject of a future pre-election judicial challenge.  In our view, assuming that all of these things will occur is unduly speculative to warrant continued judicial involvement in a case that is otherwise moot.

---

[7] In a somewhat similar vein, albeit for different reasons, it would have been unnecessary to address the issues raised connected to the sixth proposed Charter amendment, the amendment labeled "Protect Promises to Nashville," even if this case were not moot.  The trial court cited a number of reasons why this amendment could not survive pre-election judicial review, but the Metro Litigants accurately observe that not every one of these rulings was challenged in the Commission's principal brief.  Indeed, without commenting on whether or not the trial court properly considered the specific issue pre-election or otherwise accurately analyzed the issue, the trial court made findings regarding alleged violations of certain statutes, including Tennessee Code Annotated section 9-21-125, that do not appear to be challenged in the Commission's initial brief.  Argument was not offered on the matter by the Commission until its reply brief. "Issues cannot be raised for the first time in a reply brief." *Tennison Bros., Inc. v. Thomas*, 556 S.W.3d 697, 732 (Tenn. Ct. App. 2017).  Very simply, the failure to challenge one basis for the court's ruling relative to the amendment results in waiver and can therefore pretermit the necessity of engaging with the other trial court rationales that were properly challenged on appeal.

"Our judicial heritage speaks to restraint in addressing issues when the parties do not have a continuing, real, live, and substantial interest in the outcome," and "as a general rule, Tennessee's appellate courts should dismiss appeals that have become moot regardless of how appealing it may be to do otherwise." *Id.* at 210. Here, we find that the remaining issues presented involve several interesting academic questions, but the likelihood that these same issues will materialize again, and in the same form, is but a guess. As noted above, we can only speculate that these same amendments will again be the subject of a future referendum petition. Citizens may be motivated to pursue the same referendum efforts, or they may not be. Moreover, a future signature drive for a referendum petition may garner enough signatures under the Charter, or it may not.[8] Additionally, the particular concerns that may animate future action by citizens could be different. Indeed, as time changes, so too can one's plans and goals, and a given referendum effort may itself be fixed with a narrow temporal objective. As to this concern, it is of note that one of the amendments that was at issue in this case—amendment one—specifically sought, among other things, to affect fiscal years 2021-2022 and 2022-2023.

To summarize our discussion herein, this appeal cannot serve as a means to facilitate the Commission's prayed-for relief. Indeed, assuming *arguendo* that we were to find in favor of the Commission on all issues, directing it to reset an election on the proposed amendments for a future date would necessarily contravene the time parameters established in Tennessee Code Annotated section 2-3-204. Nevertheless, given the clear legal concern associated with the "prescribe a date" issue and the utility that addressing that matter would have to evaluating the validity of *any* future petition to amend the Charter, we have exercised our discretion to address that issue despite the mootness of the case. We have also concluded, however, that the remaining issues pertaining to the proposed Charter amendments should not be broached in this appeal. As discussed herein, we find it unduly speculative that these same issues will manifest in the future, and we accordingly refrain from offering any advisory opinion as to a hypothetical and uncertain course of events.[9]

---

[8] The speculation that surrounds this consideration is of particular note in light of certain facts the administrative record contains in reference to the present referendum petition. The petition to amend the Charter was submitted on March 25, 2021. This submission of the petition, and its accompanying signatures, therefore occurred on a date less than 80 days before the earlier of the alternative prescribed dates in the petition. As we have opined herein, the Charter effectively requires that, in order to be sufficient, petitions to amend it must have garnered the requisite number of signatures at least eighty days prior to the prescribed date. Although not specifically discussed previously in this Opinion, as the issue raised over it in the trial court was not pursued on appeal by any of the parties, 4GG's petition was actually circulated in two versions. Each version prescribed the same alternative dates for an election, but one version proposed a filing date for March 8, 2021. Another version proposed a filing date by March 25, 2021. (The two versions also contained some other textual differences, albeit not in relation to the text of the proposed amendments themselves). It thus appears 4GG intended to garner sufficient signatures by March 8 in order to present a petition that would comply with the earlier of the alternative prescribed dates for election. Of course, as already indicated, the petition and accompanying signatures ultimately were not submitted until March 25.

[9] We are of the opinion that similar concerns countenance against application of the "capable of

- 18 -

**CONCLUSION**

Although the controversy over the case at issue is moot given our inability to potentially provide the Commission with any relief, we have found there to be sufficient public interest to warrant addressing the "prescribe a date" concern raised in this case. As to that matter, we agree with the trial court that the Commission acted illegally in deciding to hold a referendum election given the referendum petition's failure to prescribe a single date for an election. As to the remaining issues in this case, we find it appropriate to yield to the general bar of restraint posed by the mootness doctrine and therefore refrain from offering any advisory opinion on such matters, and the trial court's judgment on those issues is vacated.


<u>    s/ Arnold B. Goldin    </u>
ARNOLD B. GOLDIN, JUDGE

---

repetition yet evading review" exception to mootness that is also potentially available in a court's discretion. *See Allen v. Lee*, No. M2020-00918-COA-R3-CV, 2021 WL 2948775, at \*3 (Tenn. Ct. App. July 14, 2021) (noting that a mere possibility that an act might reoccur is not sufficient to invoke the exception). Hypothetically assuming, however, that a future referendum petition submitted these same amendments to the Commission and the Commission voted to set them for an election, there is obviously a concern that any pre-election judicial review be expedited. That time constraints would exist, though, does not mean that these questions should necessarily evade review. As discussed earlier, courts frequently act in recognition of the time-sensitive nature of election matters when the posture of the case is appropriate that it do so. As it relates to this point, and as discussed earlier, Save Nashville Now has represented that the Commission apparently argued, in the context of the writ of certiorari proceeding relative to the setting of the September 2021 election date, that sufficient time exists for a judicial challenge once a referendum is set under Tennessee Code Annotated section 2-3-204. We agree with this sentiment in theory, at least to the extent that litigation is expedited and the parameters of the Supreme Court's *City of Memphis* decision are properly adhered to in litigation. As alluded to in this Opinion, the *City of Memphis* decision is instructive that the scope of pre-election judicial review is somewhat narrow. It does not, for instance, permit consideration of a referendum measure's substantive validity pre-election. *See City of Memphis*, 146 S.W.3d at 539-40; *see also* James D. Gordon, III, & David B. Magleby, *Pre-Election Judicial Review of Initiatives and Referendums*, 64 Notre Dame L. Rev. 298, 307 (1989) (discussing how one problem associated with pre-election review of substantive validity relates to the time pressure). Permissible topics of inquiry, such as whether a referendum measure is in proper "form," should not demand drawn-out litigation; such topics should be able to be resolved in an expedient fashion if the courts, both trial and appellate, are properly alerted to the associated time constraints that bear on the questions involved.